In the Matter of the Disposition of MOLLY, a German Shorthaired Pointer Owned by William Frederick Klumpp, Jr.

No. A05–1130.

Court of Appeals of Minnesota.

May 2, 2006.

Thomas F. Pursell, Lindquist & Vennum, P.L.L.P., Minneapolis, MN, for appellant William Frederick Klumpp, Jr.

Jerome P. Filla, Peterson, Fram & Bergman, St. Paul, MN, for respondent City of Arden Hills.

Considered and decided by MINGE, Presiding Judge; RANDALL, Judge; and COLLINS, Judge.

## OPINION

COLLINS, Judge.*

Appellant challenges the district court's order designating his dog a "dangerous dog" under Minn.Stat. § 347.50, subd. 2(2) (2004). Because we conclude that (1) respondent lacked legal authority to bring an action under the statute and (2) it cannot be concluded from the record that appellant's dog "killed" the other dog within the plain meaning of the statute, we reverse the designation.

## FACTS

Appellant William Frederick Klumpp, Jr., owns Molly, a German shorthaired pointer that weighs approximately 60 pounds. On the afternoon of October 24, 2004, Molly escaped from her kennel in the yard of Klumpp's Arden Hills home and ran onto a neighboring property belonging to Paul and Linda Mertensotto, who were in the yard with their six-pound dog, Scooter. Molly grasped Scooter by the head with her mouth and shook her back and forth. After extricating Scooter from Molly, the Mertensottos took her to the University of Minnesota Veterinary Clinic. The examining veterinarian's report states that upon arrival, Scooter had "severe head trauma," was "almost comatose," and was hemorrhaging from the mouth and nose. The report further states that when

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

the veterinarian "requested permission [to insert an] IV catheter to begin stabilization [the Mertensottos] declined and elected for euthanization."

After the Mertensottos reported the incident, the City of Arden Hills (Arden Hills) moved the district court for an order requiring Klumpp to appear and show cause why Molly should not be designated a dangerous dog under Minn.Stat. § 347.50, subd. 2(2) (2004). The district court issued the show-cause order.

At the hearing, Arden Hills acknowledged that its city code does not provide for a dangerous-dog designation and that it had not adopted any procedure to enforce the statutory dangerous-dog provision, which is not by its terms self-executing. Arden Hills explained that it was proceeding along the lines set forth in its vicious-dog ordinance, which provides that when the city seeks to have a dog declared "vicious," it "shall petition the appropriate court for a summons directing the owner of the dog to appear before the court to show cause why" the declaration is inappropriate. Arden Hills, Minn., City Code § 410.06, subd. 1, (2002).

The district court determined that Arden Hills's decision to enforce the statute by adopting the procedure in the vicious-dog ordinance was procedurally sound. The court then found that "Scooter died as a result of the wounds inflicted by Molly" and concluded that because she had killed Scooter without provocation while off of Klumpp's property, Molly must be designated a "dangerous dog" under Minn.Stat. § 347.50, subd. 2(2), compelling Klumpp to comply with the statutory registration and restriction requirements or give up Molly. This appeal follows.

## ISSUES

1. Did respondent City of Arden Hills act within its authority in bringing an action to enforce Minn.Stat. § 347.50 (2004)?

2. Did Molly "kill" Scooter within the meaning of Minn.Stat. § 347.50, subd. 2(2)?

## ANALYSIS

### I.

■ In disputing the district court's order, Klumpp contends that Arden Hills' effort to have Molly declared dangerous under Minn.Stat. § 347.50 (2004) constituted an inappropriate exercise of municipal authority because Arden Hills has never incorporated that statute into its code of ordinances and because neither the statute nor any Arden Hills ordinance sets out an enforcement procedure for dangerous-dog declarations. We agree.

Minnesota Statutes chapter 347—titled "Dogs and Cats"—establishes procedures for enforcing certain of its provisions. *See, e.g.*, Minn.Stat. §§ 347.04, .15 (2004) (describing procedure for having a dog declared a public nuisance and procedure whereby individuals whose domestic animals are killed by a dog may recover damages from the dog's owner). A dangerous dog is defined under Minn.Stat. § 347.50, subd. 2(2), as a dog that has "killed a domestic animal without provocation while off the owner's property." That designation requires the owner to register the dog and pay an annual fee of up to $500; purchase and maintain a surety bond or liability insurance of at least $50,000; confine the dog in a proper enclosure; muzzle, leash, and restrain the dog while at any place outside the proper enclosure; and comply with other requirements of the statute. Minn.Stat. §§ 347.51, subds. 2(2), (3), .52(a) (2004). But the statute does not establish a procedure by which a dog may be declared dangerous and is, therefore, not self-exe-

cuting as to such a declaration. *See Davis v. Burke*, 179 U.S. 399, 403, 21 S.Ct. 210, 212, 45 L.Ed. 249 (1900) (observing that self-executing provisions supply "a sufficient rule by means of which the right given may be enjoyed and protected, or the duty imposed may be enforced" and that provisions that "merely indicate[ ] principles, without laying down rules by means of which those principles may be given the force of law," are not self-executing (quotation omitted)). It is undisputed that Arden Hills has not incorporated or adopted the dangerous-dog statute or otherwise promulgated a procedure for its enforcement by ordinance, as have other cities seeking to enforce provisions of chapter 347. *See, e.g.,* St. Paul, Minn., Legislative Code § 200.12, .121 (2005) (defining "dangerous animal" and setting forth procedure for dangerous-animal designation); *see also Davis*, 179 U.S. at 403, 21 S.Ct. at 212 (recognizing that when a provision is not self-executing, "legislation is essential" for its enforcement).

Arden Hills argues that the legislature, in section 347.53, gives cities "the power to enforce the dangerous dog statute." But section 347.53 authorizes cities to "regulate potentially dangerous dogs," a statutory category expressly separate from and exclusive of "dangerous dogs." *See* Minn. Stat. § 347.50, subds. 2, 3 (defining "dangerous dog" *and* "potentially dangerous dog"). Moreover, the issue raised by Klumpp's assertion that Arden Hills acted outside its authority in enforcing the statute is not whether Arden Hills has the general authority to regulate dangerous dogs; Klumpp concedes that it does, provided it adopts the statute and a procedure that complies with due process. Rather, the issue is whether Arden Hills may enforce the statute without first adopting it or promulgating procedures for its enforcement.

The cases cited by Arden Hills in support of its argument that it is inherently authorized to enforce an unadopted statute—*City of St. Paul v. Whidby* and *Park v. City of Duluth*—are inapposite because they address substantive conflicts between municipal and state laws, not the municipal authority to enforce a state law in the absence of any codified enforcement procedure. *Whidby*, 295 Minn. 129, 136, 203 N.W.2d 823, 827 (1972); *Park*, 134 Minn. 296, 298, 159 N.W. 627 (1916). The *Whidby* court, commenting on the authority of municipal corporations to regulate various activities, held that municipalities' "legislative authority is conferred upon them by the constitution and the laws of the state and, 'as to matters of municipal concern they have all the legislative power possessed by the Legislature of the state, save as such power is expressly or impliedly withheld.'" 295 Minn. at 136, 203 N.W.2d at 827 (quoting *Park*, 134 Minn. at 298, 159 N.W. at 628). This language gives municipalities broad subject-matter legislative authority but does not of itself ordain the enforcement of unadopted statutes.

Arden Hills also cites *State v. Dailey* for the proposition "that statutes and ordinances on the same subject are intended to be coexistent." 284 Minn. 212, 215, 169 N.W.2d 746, 748 (1969). True; but the issue before us is not the breadth of regulatory jurisdiction. Instead, the issue calls into question Arden Hills's authority to enforce state statutes that are not self-executing; i.e., statutes that must be implemented and enforced by local agencies, in this case animal-control authorities. Arden Hills points to no authority supporting the proposition that it may enforce unadopted, non-self-executing statutory provisions absent an implementing ordinance.

We therefore hold that because neither chapter 347 nor any Arden Hills ordinance

contains an enabling procedure addressing dangerous-dog designations, and because Arden Hills has never adopted or promulgated such a procedure, Arden Hills exceeded its municipal authority by bringing the action against Klumpp for enforcement of the dangerous-dog statute.

## II.

■ Furthermore, even if Arden Hills was authorized to proceed under the statute, the district court's designation of Molly as a "dangerous dog" must be reversed because the factual record does not support the conclusion that Molly "killed" Scooter within the plain meaning of Minn. Stat. § 347.50, subd. 2(2). We review the district court's construction of a statute de novo. *Brookfield Trade Ctr., Inc. v. County of Ramsey,* 584 N.W.2d 390, 393 (Minn. 1998).

■ In interpreting and construing statutory language, our goal is to "ascertain and effectuate the intention of the legislature." Minn.Stat. § 645.16 (2004). The words and phrases of statutes must be construed according to their common meaning unless they have otherwise acquired a technical or special meaning. *Id.* at § 645.08(1) (2004). "When the words of a law in their application to an existing situation are clear and free from all ambiguity, the letter of the law shall not be disregarded under the pretext of pursuing the spirit." *Id.* at § 645.16. "Where the intention of the legislature is clearly manifested by plain unambiguous language ... no construction is necessary or permitted. Thus, prior to consideration of legislative history, a determination that [the statute under consideration] is ambiguous is necessary." *Phelps v. Commonwealth Land Title Ins. Co.,* 537 N.W.2d 271, 274 (Minn. 1995) (citation omitted). A reviewing court may not read ambiguity into an otherwise clear statute under the guise of statutory interpretation. *Tuma v. Comm'r of Econ. Sec.,* 386 N.W.2d 702, 706 (Minn.1986).

■■ When interpreting a statute, we first determine whether the statute's language, on its face, is ambiguous. *Am. Tower, L.P. v. City of Grant,* 636 N.W.2d 309, 312 (Minn.2001). A statute is ambiguous only when its language is subject to more than one reasonable interpretation. *Amaral v. Saint Cloud Hosp.,* 598 N.W.2d 379, 384 (Minn.1999). Here, section 347.50, subdivision 2(2), defines a "dangerous dog" as a dog that has "killed a domestic animal without provocation while off the owner's property." The statute does not define "killed," or any variation of the verb "kill," and the word has no special or technical meaning; nor is it ambiguous. We therefore look to its plain meaning: "To put to death" or "[t]o deprive of life." *The American Heritage College Dictionary* 762 (4th ed. 2002). Therefore, Molly killed Scooter within the meaning of the statute only if Molly deprived the other dog of life, or, as the district court found, if "Scooter died as a result of the wounds inflicted by Molly."

It is undisputed that Scooter was badly injured by Molly during the attack, but she was not dead then or upon arrival at the veterinary clinic. The Mertensottos' election to order euthanasia precluded even basic medical treatment beginning with the attempt to stabilize Scooter's condition, as suggested by the veterinarian, and her possible recovery. That is not to criticize the Mertensottos' heart-rending decision; indeed, it may be that the gravity of Scooter's condition was more apparent to them at the time than is revealed in or can reasonably be inferred from the limited record before us. However, the statute's plain language requires the direct causal connection between the act of the attacking dog and its victim's death. Therefore,

in order to determine that Molly killed Scooter within the meaning of the statute, record evidence must permit conclusions that death was the direct and inescapable consequence of the attack; that the attack rendered medical assistance futile; and that euthanasia merely hastened Scooter's inevitable, imminent death.

Whether that is the case or not cannot be known. The record before us is not sufficiently developed to permit such conclusions. Arden Hills argues that "[t]he wounds inflicted upon Scooter were so severe that the Mertensottos were forced to euthanize Scooter." But the record is void of fact or opinion evidence—from the veterinarian or otherwise—to support that assertion or to support any determination that routine medical attention was futile and that Scooter's death was the natural or inevitable result of the attack. Whether Scooter would have survived with the immediately available medical attention or that she surely would have died without it cannot be determined from the record. But the district court's legal conclusion that Molly killed Scooter within the meaning of the statute requires a factual finding that Scooter would certainly have died despite the offered medical intervention and that Scooter's death was thus directly attributable to the attack. No such factual finding was made or would have been supported by record evidence. We therefore must hold, on the record presented, that the district court erred in its legal conclusion that Molly had killed a domestic animal within the plain meaning of Minn.Stat. § 347.50, subd. 2(2).

In light of our decisions on the issues of the authority of Arden Hills to enforce the dangerous-dog provisions of chapter 347 and the district court's interpretation of section 347.50, subdivision 2(2), we do not address the other issues Klumpp raises.

## DECISION

Because Arden Hills acted without authority to enforce chapter 347, and because the record does not support the conclusion that Klumpp's dog killed a domestic animal within the plain meaning of Minn.Stat. § 347.50, subd. 2(2) (2004), we reverse the order of the district court designating Klumpp's dog a "dangerous dog" under the statute.

**Reversed.**

MINGE, J., files dissenting opinion.

MINGE, Judge (dissenting).

I respectfully dissent. With respect to whether Molly killed Scooter, I agree the record is sparse. However, it indicates that Linda Mertensotto is a nurse and that she and her husband concluded that Scooter was so badly injured that the most humane treatment was euthanization. The veterinarian noted that Scooter was almost comatose and offered what could be viewed as heroic measures. This was sufficient evidence for the district court to conclude that Molly's attack killed Scooter.

I also dissent from the holding that Arden Hills acted without authority in enforcing Minn.Stat. § 347.50, subd. 2(2) (2004), for several reasons. First, this section and the subchapter of which it is a part (Minn.Stat. §§ 347.50–.56 (2004)) set a baseline for dealing with dangerous dogs on our state. *See* Minn.Stat. §§ 347.51, subd. 1. ("No person may own a dangerous dog in this state unless...."), .515 ("The owner of a dangerous or potentially dangerous dog must have a microchip implanted.... [A]ll costs related to ... the microchip must be borne by the dog's owner."); .52 (stating that the owner of a dangerous dog must do certain things); .54 (stating that confiscation of dangerous dogs is required under certain circumstances); .55 (providing misdemeanor penalties for cer-

tain violations of earlier sections). The definitional provisions of Minn.Stat. § 347.50 are crucial to those preceding provisions. To say that the mandatory or "shall" provisions of those sections are a nullity in the state of Minnesota, absent the adoption of an ordinance or other quasi-legislative action by local governments, nullifies the legislature's will in enacting these provisions.

Second, when implementing or further action is expected by this dangerous-dog subchapter, the subchapter acknowledges such action. *See* Minn.Stat. §§ 347.51, subds. 3 (county may charge a fee); 7 (commissioner of public safety shall by rule provide for the design of a dangerous-dog tag); 8 (certain ordinances void); and .53 (local governments may regulate *potentially* dangerous dogs). These provisions suggest that the mandatory or "shall" provisions of the subchapter are intended to be effective and self-executing.

Third, the subchapter contains substantial detail with respect to dangerous dogs, and potentially dangerous dogs are not so addressed. This suggests that the core, mandatory dangerous-dog provisions should be self-executing. *See* Minn.Stat. §§ 347.50 (definitions); .51, subd. 2 (registration of dangerous dogs); § 347.52 (keeping dangerous dogs); and .54 (confiscation of dangerous dogs).

Fourth, although the caselaw is sparse on the issue of whether statutes are self-executing, the caselaw does not mandate a level of specificity for a statute to be self-executing. *See* 2A Eugene McQuillin, *Municipal Corporations* § 10.30 (3d ed. 1996). Clearly, a general listing of municipal powers indicates a need for an implementing ordinance. *Id.* However, where the question is whether enough is said about the mode of enforcement, there does not appear to be a requirement that the legislature address all details. In fact, there is invariably some detail that is always lacking. The variety of circumstances in which cases arise is so unpredictable that it is unrealistic to expect such detail in statutes, regulations, or ordinances. Those administering the law must fill in some details. Unless the missing details go to the core of the statute and cannot be fairly supplied in its administration, we should avoid holding the legislature and municipalities to too exacting a standard before we cooperate with enforcement.

Fifth, to require local units of government to develop ordinances on dangerous dogs when the legislature has addressed the topic in the detail present in this subchapter places a substantial burden on counties and cities. We have 87 counties and more than 900 cities, many with modest populations and resources. It may be manageable for larger cities and most counties to develop dangerous-dog ordinances; however, for the smaller communities it is yet another task that requires the assistance of legal counsel. Local government is responsible for myriad matters. When a statute indicates a determination to address a problem and provides significant detail, we should not place a burden on local government to choose between investing in the development of an ordinance and leaving the subject area unaddressed. That is the result of our holding in this case.

Finally, Klumpp asserts that he was not afforded due process. Arden Hills used an order-to-show-cause procedure to notify Klumpp of its intent to proceed to classify Molly a dangerous dog. A hearing was scheduled before a district court judge on the merits. There is clearly compliance with the requirements of procedural due process. *See Mathews v. Eldridge,* 424 U.S. 319, 334–35, 96 S.Ct. 893, 902–03, 47 L.Ed.2d 18 (1976).

Based on the foregoing considerations, I would affirm.